IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| AMERICAN CANOE ASSOCIATION, INC. | : | |
| v. | : | CIVIL NO. L-00-484 |
| WESTVACO CORPORATION, ET AL. | : | |

## MEMORANDUM

On February 22, 2000, plaintiff American Canoe Association, Inc. filed a citizen suit for penalties and injunctive relief under section 505 of the Clean Water Act, 33 U.S.C. § 1365, against the following defendants: the Upper Potomac River Commission ("UPRC"), John J. McMullen, Jr., who is the Chairman of the UPRC, James H. Taylor, who is the Superintendent of the UPRC's wastewater treatment plant, and the Westvaco Corporation ("Westvaco"). On March 24, 2000, defendants filed a motion to dismiss on the grounds that the Court lacks jurisdiction over the ACA's Complaint.[1]

On February 21, 2001, the Court held a hearing on defendants' motion and, shortly thereafter, denied the motion and ordered limited discovery on the jurisdictional question. On September 18, 2001, defendants renewed their jurisdictional argument in the instant motion for summary judgment. For the reasons stated below, the Court shall, by separate order, grant defendants' motion for summary judgment and direct the clerk to close the case.

## I. BACKGROUND

---

[1] In addition to this jurisdictional argument, defendants argue that plaintiff's suit is barred by the doctrine of res judicata. Because the Court resolves the jurisdictional question in defendants' favor, it need not reach the res judicata issue.

The Upper Potomac River Commission ("the UPRC") operates a wastewater treatment plant ("UPRC facility") in Westernport, Maryland. The wastewater processed at the UPRC facility generally comes from two sources. The first source is the sanitary wastewater and storm water runoff from three nearby towns (collectively the "Municipal Influent").[2] The second source is the wastewater produced by Westvaco's pulp and paper mill plant ("Westvaco Influent").

Pursuant to a permit issued August 1, 1990 by the Maryland Department of the Environment ("MDE"), the UPRC facility was authorized to discharge wastewater into the North Branch of the Potomac River. The UPRC's permit set numerical limits for the discharge of some types of pollutants, but merely required that the UPRC monitor and report the discharge of other types of pollutants.

Founded in 1880, the American Canoe Association, Inc. ("ACA") is a nonprofit organization dedicated to the promotion of paddlesports such as canoeing, kayaking, and rafting. On December 22, 1999, the ACA gave written notice of alleged violations of the discharge limits set by the UPRC's permit for fecal coliforms. The ACA mailed its notice to the Environmental Protection Agency, the MDE, the Maryland Department of Natural Resources, and defendants UPRC and Westvaco The ACA's letter claimed that the violations were caused by Westvaco's discharges to the UPRC facility.

On February 10, 2000, representatives of the UPRC and Westvaco met with representatives of the MDE to discuss the alleged violations. Prior to the meeting, the MDE had advised the UPRC that fecal coliforms fell into the category of pollutants that the Commission was required to monitor and report, as opposed to the category on which the UPRC's permit set

---

[2] The three towns were Luke and Westernport, Maryland, and Piedmont, West Virginia.

numerical limits. At the February 10th meeting, however, the MDE informed the UPRC and Westvaco that it had changed its position and had concluded that the UPRC facility's fecal coliform discharges were subject to numerical limits, which the facility had regularly exceeded.

After the February 10th meeting, the MDE's water enforcement manager, Carol Coates, used the EPA's BEN model to calculate the economic benefits of the UPRC's non-compliance. Ms. Coates concluded that compliance would have cost roughly $900,000 if the costs had been borne by the UPRC, and roughly $1,000,000 if the costs had been borne by Westvaco. Ms. Coates' calculation was premised on the MDE's conclusion that the Municipal Influent, as opposed to the Westvaco Influent, was the source of the fecal coliform violations. Ms. Coates plugged in the cost of an upgrade to the municipal portion of the UPRC facility. The estimated cost of this upgrade was $2.6 million.

On February 11, 2000, the MDE, the UPRC, and Westvaco entered into settlement negotiations. On February 18, 2000, the MDE filed suit against the UPRC and Westvaco in the Circuit Court for Allegany County ("the state action"). On the same day, the parties submitted a consent judgment to the Circuit Court. The consent judgment:

(i) imposed a monetary fine of $450,000,

(ii) set interim limits on the discharge of fecal coliforms,

(iii) established an outside date of April, 2002, for full compliance with the fecal coliform discharge limits set forth in the permit,

(iv) provided for continued court supervision and self-monitoring to ensure compliance by the UPRC and Westvaco with permit requirments,

(v) included a schedule for an upgrade to the UPRC facility designed to reduce fecal coliform discharges resulting from the Municipal Influent, (the "Municipal Upgrade"), and

(vi) imposed stipulated penalties if the upgrade fell behind schedule.

By February 21, 2000, the circuit court advised the ACA of the suit and the proposed

consent judgment. The ACA did not intervene in the state action, nor did it comment substantively on the consent judgment. Instead, on February 22, 2000, the ACA filed the instant federal suit. On February 23, 2000, the ACA wrote to the Honorable J. Frederick Sharer of the Circuit Court for Allegany County stating that it would provide substantive comments within 30 days after discovery had closed in the instant federal suit. Judge Sharer declined to wait for the ACA's comments, however, and, on March 1, 2000, approved the consent judgment.

The consent judgment did not specify any particular upgrades designed to deal with the fecal coliform emissions of the Westvaco Influent. Instead, it required generally that both Westvaco and the UPRC take whatever measures were necessary to come into compliance with permit limitations. Shortly before the consent order was entered, Westvaco began disinfecting its sanitary wastewater. After the entry of the consent judgment, Westvaco began work on a $2.65 million dollar pipeline designed to carry its sanitary sewage to the UPRC's municipal treatment facilities.

Since the entry of the consent judgment on March 1, 2000, there have been only two violations of the fecal coliform limits set in the UPRC's permit. Since April 4, 2000, there have been none.

## II. STANDARD FOR SUMMARY JUDGMENT

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of

material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

**ANALYSIS**

The Clean Water Act ("CWA") places primary enforcement responsibility in the hands of federal and state agencies. 33 U.S.C. §§ 1319, 1342(b)(7). Citizen suits such as the instant complaint are a supplemental enforcement mechanism. Accordingly, the CWA provides that federal courts only have jurisdiction over citizen suits when federal and state enforcement has proven inadequate. See Gwaltney of Smithfield v. Chesapeake Bay Foundation, 484 U.S. 49, 61 (1987).

After a citizens group submits notice of an alleged violation of the CWA, a state agency such as the MDE has a 60-day window in which to prosecute the polluters. During this 60-day period, the state's authority to prosecute is exclusive, and a citizen suit may not be filed. After the 60-day window has closed, a citizen suit may be filed, but the suit remains subject to a jurisdictional bar. Specifically, the CWA bars a citizen suit altogether in cases where federal or state agencies have "diligently prosecuted" the violators. Clean Water Act, § 505(b)(1); 33 U.S.C. § 1365(b)(1).

Citizens bringing suits to redress violations that have already been prosecuted by state or federal agencies bear the burden of proving that the federal or state prosecution was lax. See Williams Pipe Line Co. v. Bayer Corp., 964 F. Supp. 1300, 1334 (S.D. Iowa 1997). "This burden is a heavy one because diligence on the part of the enforcement agency is presumed." Friends of the Earth, Inc. v. Laidlaw Envtl Servs. Inc., 890 F. Supp. 470, 487 (D.S.C. 1985). When a state agency has already addressed the concerns of an analogous citizen suit, "deference to the agency's plan of attack should be particularly favored." North and South Rivers Watershed

Ass'n v. Scituate, 949 F.2d 552, 557 (1st Cir. 1991).

Although factors such as the seriousness and persistence of the violations, the strength of the state's case on the merits, the monetary recovery, and the injunctive relief obtained are all relevant to assessing diligence, "the statute calls for a more deferential approach that does not circumscribe the administrator's discretion to implement a plan that . . . adequately addresses a violation." Friends of the Earth, Inc. 890 F. Supp. at 486-7. Accordingly, a court may find that the prosecution was diligent even in cases in which no monetary penalty was assessed, so long as the "[s]tate [o]rder represents a substantial, considered and ongoing response to the violation." Scituate, 949 F.2d at 557.

Defendants argue that the MDE's prosecution of the fecal coliform violations was diligent prosecution, and, therefore, the ACA's suit is barred jurisdictionally. Specifically, defendants' motion raises two questions: (i) whether the ACA's suit attempts to require compliance with the same standard or limitation that the MDE sought to enforce in the state action; and, (ii) whether the MDE was diligent in its prosecution of the state action.

The Court finds that the ACA's suit seeks compliance with the same standard as the MDE's suit, namely the fecal coliform limit set by the UPRC's permit. The ACA alleges a greater number of violations than the MDE alleged in the state action. Nevertheless,

> a federal court ought not to allow a citizens' suit to proceed merely because a prior pending state suit has not alleged as many separate violations of the Act as the citizens' suit and therefore seeks to impose a less substantial civil penalty on the defendant.

Connecticut Fund for the Enviroment v. Contract Plating Company, 631 F. Supp. 1291, 1293 (D. Conn. 1986). Accordingly, the deciding question is whether the MDE diligently prosecuted defendants for the permit violations.

The ACA contends that the state action was not diligent because, in its view, the

Westvaco influent, as opposed to the Municipal Influent, was the true source of the fecal coliform violations. The ACA argues that the MDE's mistaken assumption as to the source of the violations renders the MDE's prosecution lax.

This argument focuses on the means employed by the MDE to achieve compliance with the fecal coliform limitations, as opposed to the end result of the MDE's prosecution. The ACA concedes that defendants met the compliance deadlines imposed by the consent judgment. The ACA does not contend that the schedule of interim limits or the deadline for full compliance was lax. Rather the ACA argues that the injunctive relief specified by the consent judgment, the Municipal Upgrade, did not address the actual source of the problem. The consent judgment should have required remedial action directed at Westvaco's Influent (hereafter the "Westvaco Upgrade"), rather than the Municipal Upgrade, the ACA contends.

As a result of this alleged mistake as to the source of the violations, the ACA also argues that the monetary penalty contained in the consent judgment was calculated incorrectly. In order to determine an appropriate monetary penalty, state agencies such as the MDE calculate the economic benefit derived by a polluter from polluting. The ACA complains that the MDE's economic benefit calculation was based on the cost of the Municipal Upgrade, instead of the Westvaco Upgrade.

The costs of the two upgrades, however, are very close. The Municipal Upgrade was estimated to cost $2.6 million, and the Westvaco Upgrade was estimated to cost $2.65 million.[3] Thus, setting aside the question of the appropriate discount/compound rate, even if the MDE had

---

[3] The Westvaco Upgrade is now almost complete. In a letter sent to both the ACA and the Court, defendants have confirmed that, although final figures are not yet available, the pipeline will be completed under budget at a cost of roughly $2.4 million.

calculated defendants' benefits using the cost of the Westvaco Upgrade, the resulting penalty would have been roughly equivalent to the penalty resulting from the MDE's calculation.

The Court finds that the MDE's prosecution was diligent, and that the ACA's suit is, therefore, jurisdictionally barred. The MDE obtained relief in every available category, including a significant monetary fine, interim limits, an outside date for full compliance, and continued court supervision. Also, the state had a weakness in its case given the vagueness of the permit and the MDE's prior advice to defendants that the fecal coliform limits were advisory only. The ACA cites no case in which a court has failed to uphold as diligent such a comprehensive remedy.

The MDE used the EPA's BEN Model to calculate defendant's economic benefits from the fecal coliform violations. The ACA concedes that the BEN Model is an acceptable method for calculating economic benefits. The discount/compound rate used by the MDE was the BEN default value, and the Court finds this rate acceptable, although the ACA pressed for a different, higher default rate.

Although the MDE settled for roughly half of the benefit calculated, this was not unreasonable given the desirability of settlement, the broad scope of the consent judgment, the flaws of the state's case, and the deference the statute requires the Court to accord to the MDE's authority to craft suitable remedies. Given the circumstances of this case, it was within the MDE's discretion to determine that a larger penalty was unnecessary adequately to punish defendants and deter future permit violations. Cf. Arkansas Wildlife Federation v. ICI Americas Inc. 842 F. Supp. 1140, 1148 (E.D. Ark.,1993) (violator's cooperativeness and efforts to correct violation are appropriate mitigating factors when assessing monetary penalty).

"The goal of all actions brought under the Clean Water Acts is 'to restore and maintain

8

the chemical, physical, and biological integrity of the nation's waters.'" North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 556 (1st Cir. 1991)(quoting 33 U.S.C. §§ 1251(a)). The MDE's prosecution should be judged by how well it achieved this goal, and it is clear that the ultimate result of the MDE's prosecution falls within the boundaries of "diligent."

Accordingly, defendants' motion for summary judgment will be GRANTED, by separate order.

It is so ORDERED this  12TH  day of August, 2002.

Benson Everett Legg
United States District Judge